IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **UNDER SEAL** |
| | ) | |
| | ) | Criminal Action No. 3:21-cr-132 |
| | ) | |
| | ) | Conspiracy to Commit Wire Fraud |
| | ) | 18 U.S.C. § 1349 |
| v. | ) | (Count 1) |
| | ) | |
| | ) | Wire Fraud |
| CARL ANTHONY MCNEILL | ) | 18 U.S.C. §§ 1343 & 2 |
| | ) | (Counts 2-5) |
| and | ) | |
| | ) | Conspiracy to Launder Monetary |
| KSYNTOILIOUS MILLER, | ) | Instruments |
| a.k.a "Tolie," | ) | 18 U.S.C. § 1956(h) |
| | ) | (Count 6) |
| Defendants. | ) | |
| | ) | Criminal Forfeiture Allegation |
| | ) | 18 U.S.C. §§ 981 & 982 |

## INDICTMENT

November 2021 Term - At Richmond, Virginia

THE GRAND JURY CHARGES THAT:

### INTRODUCTORY ALLEGATIONS

At all times relevant to this Indictment:

#### Defendants, Co-Conspirators, and Related Entities

1. Defendant CARL ANTHONY MCNEILL was the Chief Executive Officer and a Managing Partner of C&D Corporate Services (C&D), a financial advisory firm that sold insurance. Creative Capital Partners (CCP) was a subsidiary of C&D that, in addition to other services, brokered commercial loans and mortgages, both directly and via various subsidiaries or

1

associated entities. At various times during the conspiracy and fraud scheme described in this Indictment, MCNEILL lived in the Eastern District of Virginia and in the Commonwealth of Pennsylvania, and performed duties related to his role at C&D/CCP in both locations.

2. Defendant KSYNTOILIOUS MILLER, also known as "Tolie," was the President and a Managing Partner of C&D. MILLER lived and performed duties related to his role at C&D in the Eastern District of Virginia.

3. C&D/CCP claimed that it could obtain loans for individuals, businesses, and other entities that could not obtain loans through banks and other more conventional lending sources. C&D/CCP required the victims to provide a down payment of between ten and fourteen percent of the loan amount sought.

4. Co-Conspirator 1, a resident of the Atlanta, Georgia metropolitan area, owned Business A. Co-Conspirator 1, acting on his own behalf and on behalf of Business A, made solicitations from victims in joint ventures with C&D/CCP.

5. Insurance Company A was formed under the laws of the State of Georgia. Co-Conspirator 1 sometimes corresponded with C&D/CCP clients on Insurance Company A letterhead regarding funds C&D/CCP clients deposited with C&D/CCP, representing himself as "Attorney-in-Fact" for Insurance Company A.

### The Scheme and Artifice to Defraud

6. Beginning prior to September 2016, and continuing through on or about February 19, 2019, the exact dates being unknown, in the Eastern District of Virginia and within the jurisdiction of this Court, as well as elsewhere, defendants CARL ANTHONY MCNEILL, KSYNTOILIOUS MILLER, also known as "Tolie," Co-Conspirator 1, and others known and unknown to the Grand Jury, did knowingly, unlawfully, and with intent to defraud, execute and

attempt to execute a scheme and artifice to defraud and to obtain property by means of materially false and fraudulent pretenses and promises through the transmission of signs, signals, and writings in interstate commerce.

### Purpose of the Scheme and Artifice to Defraud

7. The purpose of the scheme was for MCNEILL, MILLER, and the other co-conspirators to unlawfully enrich themselves by: (a) making a series of false representations about their ability to obtain loans for clients; (b) falsely assuring clients that funds would be held in escrow or some other arrangement that would guarantee return of the funds should the members of the scheme be unable to obtain loans for the clients; (c) making false representations about insurance policies that would purportedly guarantee funds entrusted to the defendants and their co-conspirators by clients and how the premiums on those policies would be paid; and (d) fraudulently converting the funds clients entrusted to the defendants and their co-conspirators' own use.

### Manners and Means of the Scheme and Artifice to Defraud

8. The manner and means of the scheme and artifice to defraud included, but were not limited to, the following:

    a. MCNEILL, MILLER, Co-Conspirator 1, and others approached individuals, businesses, and other entities in need of loans. They offered these victims the prospect of obtaining those loans with an advance payment or payments made to C&D/CCP. C&D/CCP was not to provide the funding under the proposed arrangements. MCNEILL, MILLER, and Co-Conspirators 1 and 2, as well certain employees of C&D/CCP, made a series of false representations about C&D/CCP's purported relationships with major investment banks such as Morgan Stanley, HSBC, and Deutsche Bank. On occasion, they also made false representations

regarding their past success in obtaining loans for previous clients.

    b.    MCNEILL, MILLER, Co-Conspirator 1, and others, including certain employees of C&D/CCP, made a series of false representations to actual and potential clients that client payments would be held in escrow or a similar arrangement under which the funds would be available for return to the client. The transactions were governed by "Facilitation Agreements" providing that if C&D/CCP failed to obtain the loan within a set time, the payment would be refunded.

    c.    Notwithstanding the representations described in paragraph 12(b), the co-conspirators converted the monies clients entrusted to C&D/CCP to their own use without providing the promised loans.

    d.    On occasion, clients were told that the transactions in question would be insured by policies issued by Insurance Company A. The clients were not told that the premiums for these policies would be paid out of the entrusted funds. Rather, the clients believed, consistent with the Facilitation Agreements, that the entrusted funds would be returned in their entirety if C&D/CCP did not receive the loan sought.

    e.    Entrusted funds sent to Insurance Company A, in almost all instances, were not actually used to purchase insurance policies, but instead were converted to the personal use of the individual who owned Insurance Company A. In most instances, Insurance Company A did not have sufficient funds on hand to satisfy any claim a client might make on a policy.

    f.    No client of C&D/CCP ever received the loan promised.

    g.    On occasion, the defendants and their co-conspirators sent emails, letters, or other correspondence to frustrated clients who had not received the promised lines of credit to explain why the promised funds were not available and apprise the clients as to when they might receive

funds. These emails and letters contained many of the same false representations described above.

h.  As a result of this scheme to defraud, the defendants and their co-conspirators obtained at least $6,478,795 in funds to which they were not entitled.

**Conduct in Furtherance of the Scheme and Artifice to Defraud**

*Client 1*

9.  Client 1 is a church located in Williamsburg, Virginia. In December 2016, Client 1, acting through a Bishop of the church, entered into an agreement under which Client 1 deposited a total of $90,000 in escrow with C&D/CCP to receive a credit line in the approximate amount of $900,000. An employee of C&D/CCP told the Bishop that Client 1's funds would he held in an escrow account until it received its line of credit. The employee also told the Bishop that the $90,000 would be protected by an insurance policy.

10.  On the following dates, Client 1 wired the sums set forth below to C&D/CCP's PNC Bank account number xx-xxxx-1153, acting on directions from an employee of C&D/CCP:

- December 22, 2016: $10,000
- December 28, 2016: $80,000

Although C&D/CCP had a purported escrow account, account number xx-xxxx-1153 was an operating account from which C&D/CCP paid routine expenses. Following the deposit of Client 1's funds into account number xx-xxxx-1153, those funds were used to meet C&D/CCP's payroll and other expenses.

11.  As of March 24, 2017, Client 1 had not received its line of credit. On that day, Co-Conspirator 1 sent a letter to MILLER on the letterhead of Insurance Company A, with the

stated intent that MILLER share the letter with frustrated C&D/CCP clients. In the letter, Co-Conspirator 1 related that the delay in funding was caused by a typographical error that occurred in a document related to the wiring of funds. The letter then falsely stated that the "final documents" were going to be submitted to "Morgan Stanley" and that the transaction would be "monetized" by Mellon Bank. In fact, none of the co-conspirators or related entities had any relationship whatsoever with those two entities. Finally, the letter referred to a non-existent policy that insured the transaction. MILLER sent this letter to the Bishop.

12. As of June 14, 2017, Client 1 had not received its line of credit and the Bishop had inquired about the funds deposited in escrow. On that day, MCNEILL sent an email to the Bishop stating that he was attaching a screen shot "of one Escrow Account" at MILLER's request. MCNEILL attached to this email a screenshot of account summaries purporting to show that C&D/CCP had a $611,995.23 balance in its escrow account. In fact, Client 1's funds had never been placed into an escrow account and had been spent over six months before this email correspondence. MCNEILL advised the Bishop to address further questions to MILLER.

13. Around June 29, 2017, the Bishop discovered that Client 1's funds had not been placed in escrow. On that day, the Bishop sent an email to MILLER demanding the return of these funds.

14. On July 26, 2017, Client 1 received a wire in the amount of $90,000 from C&D/CCP's PNC Bank escrow account number xx-xxxx-8851. Although the memo for this transaction read "Deposit Refund," the funds used in this transaction consisted largely of funds collected from other clients.

### *Client 2*

15. Client 2 is the owner of a construction company based in Chesterfield, Virginia. In May 2017, Client 2 was seeking a line of credit with which to start a hard money lending business. At that time, Client 2 entered into an agreement under which Client 2 (under the name of his construction company) deposited a total of $100,000 in escrow with C&D/CCP to receive a credit line in the amount of $1,000,000. The agreement further provided that the credit line would be provided though Morgan Stanley, and falsely represented that C&D "has a long standing and direct relationship with the asset provider and the financial institution referenced here [Morgan Stanley] within." The agreement expressly provided that the agreement would be valid for only fifty business days and that C&D would refund the Client 2's escrowed deposit within 30 days if the agreement was terminated. Finally, in a section of the agreement entitled, "NON-CIRCUMVENTION," Client 2 agreed "not to directly or indirectly engage, contact, contract or transact the Financial Institutions, Attorneys, Lenders, and known associates" that C&D/CCP was employing in the transaction.

16. C&D/CCP directed Client 2 in writing to wire the $100,000 into PNC Bank account number xx-xxxx-8851, specifically representing that that account was a "holding account."

17. On or about May 9, 2017, Client 2 made a wire transfer of $100,000 from his SunTrust Bank account in Richmond, Virginia to C&D's PNC Bank escrow account number xx-xxxx-8851 in the Commonwealth of Pennsylvania. The funds were not held in escrow as promised but were instead, along with escrowed funds from other C&D/CCP clients, used to refund the deposits of other frustrated clients who had not received lines of credit. The funds were also used to cover C&D/CCP's payroll and other operating expenses.

18. Client 2 entered a similar arrangement with C&D/CCP on behalf of a church seeking a $1.5 million line of credit. Client 2 made a $150,000 deposit on behalf of the church, for which Client 2 was to be re-paid by the church when it received the line of credit. Client 2 was also to receive a fee for assisting the church with the transaction.

19. On or about May 18, 2017, Client 2 made a wire transfer of $150,000 from his SunTrust Bank account in Richmond, Virginia to C&D's PNC Bank escrow account number xx-xxxx-8851 in the Commonwealth of Pennsylvania. The funds were not held in escrow as promised but were instead, along with escrowed funds from other C&D/CCP clients, used to refund the deposits of other frustrated clients who had not received lines of credit. The funds were also used to cover C&D/CCP's payroll and other operating expenses.

20. On or about May 25, 2017, Client 2 received an email from a C&D/CCP employee acting, in her words, "on behalf of CA McNeill." In this email, the employee confirmed receipt of the deposited funds and falsely stated that they had been "deposited into our company escrow account." The employee represented that the anticipated funding date for the line of credit was July 24, 2017. That date passed without Client 2 receiving the promised line of credit. Thereafter, Client 2 sought a refund from C&D/CCP.

21. On or about September 20, 2017, Client 2 received an email from MCNEILL claiming that while C&D/CCP had requested a refund from the "provider," that had been delayed by hurricanes. MCNEILL represented that Client 2 would receive a refund by the end of the following week. That date passed without Client 2 receiving the promised line of credit.

22. On or about September 28, October 11, October 20, November 3, and November 30, 2017, Client 2 received emails from a C&D/CCP employee with letters signed by MILLER

8

attached to them. MILLER titled each of these letters as "Refund Delay" and claimed that the refund would be disbursed at some time shortly after the date on the letter.

23. To date, neither Client 2 nor the church has received the return of the sums deposited or the lines of credit.

## COUNT ONE
(Conspiracy to Commit Wire Fraud)

24. Paragraphs 1 through 23, including all subparagraphs, of this Indictment are incorporated by reference as if fully set forth here.

25. Beginning prior to on or about September 2016, and continuing through on or about February 19, 2019, the exact dates being unknown, in the Eastern District of Virginia and within the jurisdiction of this Court, as well as elsewhere, defendants CARL ANTHONY MCNEILL and KSYNTOILIOUS MILLER, also known as "Tolie," unlawfully and knowingly conspired with each other, with Co-Conspirator 1, and with others, known and unknown to the Grand Jury, to commit the offense of wire fraud, that is: to knowingly execute and attempt to execute a scheme and artifice to defraud and to obtain property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing the scheme and artifice to defraud, transmitted and caused transmission of writings, signs, and signals in interstate and foreign commerce, in violation of Title 18, United States Code, Section 1343.

### Purpose of the Conspiracy

26. The Grand Jury realleges and incorporates by reference paragraph 7 of this Indictment as a description of the purpose of the conspiracy.

9

**Manner and Means of the Conspiracy**

27. The Grand Jury realleges and incorporates by reference paragraph 8 including all subparagraphs, of this Indictment as a description of the manner and means of the conspiracy.

(All in violation of Title 18, United States Code, Section 1349.)

## COUNTS TWO THROUGH FIVE
(Wire Fraud)

28. Paragraphs 1 through 23, including all subparagraphs, of this Indictment are incorporated by reference as if fully set forth here.

29. On or about the following dates, in the Eastern District of Virginia and within the jurisdiction of this Court, as well as elsewhere, for the purpose of executing and attempting to execute the scheme and artifice to defraud, defendants CARL ANTHONY MCNEILL and KSYNTOILIOUS MILLER, also known as "Tolie," aided, abetted, induced, counseled, and encouraged by each other, by Co-Conspirator 1, and by others known and unknown to the Grand Jury, caused to be sent and delivered in interstate and foreign commerce via wire communication the signs, signals, and writings set forth below:

| Count | Approximate Date | Wire Communication |
|---|---|---|
| 2 | 12/22/2016 | $10,000 wire transfer from Client 1's bank account with Wells Fargo in the Eastern District of Virginia via New York Federal Reserve Bank Fed Wire data center in East Rutherford, New Jersey to C&D/CCP's PNC Bank account number xx-xxxx-1153 in the Commonwealth of Pennsylvania |
| 3 | 12/28/2016 | $80,000 wire transfer from Client 1's bank account with Wells Fargo in the Eastern District of Virginia via New York Federal Reserve Bank Fed Wire data center in East Rutherford, New Jersey to C&D/CCP's PNC Bank account number xx-xxxx-1153 in the Commonwealth of Pennsylvania |

| Count | Approximate Date | Wire Communication |
|---|---|---|
| 4 | 5/9/2017 | $100,000 wire transfer from Client 2's bank account with SunTrust Bank in the Eastern District of Virginia via New York Federal Reserve Bank Fed Wire data center in East Rutherford, New Jersey to C&D/CCP's PNC Bank escrow account number xx-xxxx-8851 in the Commonwealth of Pennsylvania |
| 5 | 5/18/2017 | $150,000 wire transfer from Client 2's bank account with SunTrust Bank in the Eastern District of Virginia via New York Federal Reserve Bank Fed Wire data center in East Rutherford, New Jersey to C&D/CCP's PNC Bank escrow account number xx-xxxx-8851 in the Commonwealth of Pennsylvania |

(In violation of Title 18, United States Code, Sections 1343 & 2.)

## COUNT SIX
(Conspiracy to Launder Monetary Instruments)

30. Paragraphs 1 through 29, including all subparagraphs, of this Indictment are incorporated by reference as if fully set forth here.

31. Beginning prior to in or around September 2016, and continuing through on or about February 19, 2019, the exact dates being unknown, in the Eastern District of Virginia and within the jurisdiction of this Court, as well as elsewhere, defendants CARL ANTHONY MCNEILL and KSYNTOILIOUS MILLER, also known as "Tolie," along with Co-Conspirator 1 and others known and unknown to the Grand Jury, did unlawfully and knowingly combine, conspire and agree to commit offenses against the United States, that is:

    a. to conduct and attempt to conduct financial transactions involving the proceeds of a specified unlawful activity (that is, Conspiracy to Commit Wire Fraud, in violation of Title 18, United States Code, Section 1349; and Wire Fraud, in violation of Title 18, United States Code, Section 1343) with the intent to promote the carrying on of the specified unlawful activity, knowing that the property involved in the financial transactions represented the proceeds of some

11

form of unlawful activity, in violation of Title 18 United States Code, Section 1956(a)(1)(A)(i); and

      b. to knowingly engage and attempt to engage, and cause and aid and abet others in engaging, in monetary transactions in criminally-derived property that was of a value greater than $10,000 in violation of Title 18, United States Code, Section 1957.

### Purpose of the Conspiracy

32. It was the purpose of the conspiracy that MCNEILL, MILLER, Co-Conspirator 1, and others conducted financial transactions to obtain and spend the unlawful proceeds of their fraud, to ensure the continuation of the fraud, and to ensure that each co-conspirator had sufficient financial incentive to continue participating in the fraud.

### Manner and Means of the Conspiracy

33. It was part of the conspiracy that MCNEILL, MILLER, Co-Conspirator 1, and others induced clients to entrust them with money in return for obtaining lines of credit. These inducements were made under various false pretenses, including that the funds would be held in escrow or otherwise secured for return, or that an insurance policy would compensate the clients for their advanced funds in the event they did not receive lines of credit. These inducements caused clients to entrust funds in the approximate amount of $6,478,795 to C&D/CCP.

34. It was further part of the conspiracy that MCNEILL directed the expenditures of the proceeds of the fraud scheme to cover the payroll and operating expenses of C&D/CCP, to make payments directly to himself, MILLER, and Co-Conspirator 1, and to return funds to prior frustrated clients, in order to promote the continuation of the specified unlawful activity.

(In violation of Title 18, United States Code, Section 1956(h).)

## CRIMINAL FORFEITURE ALLEGATION

Pursuant to Rule 32.2(a) FED. R. CRIM. P., the defendants are notified that, if convicted of the offenses alleged in Counts One through Six, they shall forfeit to the United States any property constituting, or derived from, proceeds obtained directly or indirectly as the result of such violations, including, but not limited to, any assets which may be directly forfeitable as proceeds or subject to forfeiture as a substitute asset.

Property subject to forfeiture includes, but is not limited to, **a money judgment in the amount of at least $6,478,795.**

(In accordance with Title 18, United States Code, Section 981(a)(1)(C), as incorporated by 28 U.S.C. § 2461(c).)

A TRUE BILL:

_____
FOREPERSON

Pursuant to the E-Government Act, the original of this page has been filed under seal in the Clerk's Office

JESSICA D. ABER
UNITED STATES ATTORNEY

By: _____
Michael C. Moore
Assistant United States Attorney

By: _____
Avishek Panth
Assistant United States Attorney